### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DIANE ADDISON            )<br>                          )<br>                          )<br>      **Plaintiff,**      )<br>                          )<br>v.                        )<br>                          )<br>JOANNE B. BARNHART, Commissioner of the  )<br>Social Security Administration,   )<br>                          )<br>      **Defendant.**      ) | Case No. 05-CV-221-PJC |

### ORDER

Claimant, Diane Addison ("Addison"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Claimant's application for disability benefits under the Social Security Act. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Addison appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Claimant was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

Addison was born on July 12, 1952, which made her fifty-one at the time of the hearing. (R. 49, 233). Addison testified that, at the time of the hearing, she was married and lived with her husband and nineteen-year-old son. (R. 233). She has a twelfth-grade education, and was previously employed as a cashier and a front desk clerk. (R. 233, 249).

Addison alleges she became unable to work on June 18, 2001 due to injury to her right foot and left ankle, difficulty sleeping, osteoarthritis, osteoporosis, osteopenia, degenerative disc disease, fibromyalgia, rashes, lupus, dizziness from medication, nausea and sleepiness. (R. 65, 233-48). Claimant testified at the hearing that she had depression and memory problems, and that she was not comfortable around other people. (R. 242-43). Claimant also testified that her medications caused her to become dizzy, drowsy and nauseated. (R. 245-46).

On September 12, 1979, Claimant was diagnosed with degenerative disc disease. (R. 104). She was given a series of exercises, fitted with a lumbosacral corset, and prescribed Parafon Forte to treat her condition. *Id*.

On January 21, 2001, Claimant was treated for pain and swelling of her right foot at the emergency room at St. John's Carroll Regional Medical Center. (R. 108). She was diagnosed with a fractured metatarsal. (R. 109). Her treating physician, Randy K. Miller, D.O., noted on February 23, 2001 that the bone did not appear to be forming a callus or showing signs of healing, and he suspected osteoporotic activity. (R. 210). Dr. Miller ordered a bone densitometry test which indicated osteopenia of the left femur and lumbar spine. (R. 111, 210). Based on the test results, Dr. Miller concluded that there was no full-blown osteoporotic progression and that the condition could be reversed with medication he prescribed. (R. 111, 209).

In April 2001, Dr. Miller referred Addison to rheumatologist Stanley P. Hayes, M.D., to determine if her elevated ANA was attributable to lupus. (R. 207-08). Dr. Hayes concluded that Addison's positive ANA of 1:80 was a false positive because it did not appear to have any clinical correlation. (R. 130-31). He also found that her joints were not swollen, and that her

shoulders, hips and knees had full or good mobility. (R.131). Dr. Hayes noted that Addison's complaints were consistent with osteoarthritis and that her soft tissue pain was typical of fibromyalgia. *Id*. Dr. Hayes' records indicate that he discussed with Claimant the importance of regular exercise, such as walking two miles or thirty minutes daily. *Id*. Consistent with Dr. Hayes' opinion, Dr. Miller continued to treat Addison for osteoarthritis, osteoporosis and depression/anxiety with medication. (R. 206).

Addison was brought to St. John's Carroll Medical Center on February 16, 2002, after her husband noticed that she was not making sense. (R. 122). The nursing assistant noted that Claimant seemed to be having difficulty maintaining her thought process, but a computed cerebral tomography was negative and she was released. (R. 122, 128). In a follow-up visit, Dr. Miller reviewed the hospital tests and finding nothing contributory to Addison's confusion, he considered her sudden cessation of Prozac as a possible cause. (R. 198). He opined that the "hive reactions" she reported were stress-related and placed her on Atarax. *Id*.

Addison visited Dr. Miller for a re-check of her rash on April 25, 2002. (R. 197). Dr. Miller opined that the rash was a discoid lupus problem "associated with her previous silicon breast implants that have leaked," over which there was present litigation. *Id*. He prescribed hydroxy Chloroquine and Triamcinolone to help relieve Claimant's itching and prevent scarring, and instructed her to return if her blood pressure became elevated while on the medications. *Id*. On May 7, 2002, Dr. Miller reported that her rash was "markedly improved with the Chloroquine at the lowest dose we can place her on" and though her ANA was still positive at 1:80, he felt that "she will be improving but slowly." (R. 196). This is the last record from Dr. Miller other than his August 1, 2002 "Statement Regarding Missouri Disability." (R. 192). In

the August 1, 2002 statement, Dr. Miller reported that he had been unable to follow Claimant since he diagnosed her with discoid lupus, and that he had only attended to her usual medical needs since the diagnosis. *Id*. Dr. Miller stated he could not conjecture about her ability to do gainful employment or any disabilities she may have. *Id.* Dr. Miller stated that he felt Claimant could probably do some work, such as office work or other work with minimal standing and lifting, but that she would probably be unable to tolerate rigorous jobs such as waiting tables and excessive lifting. *Id.* Dr. Miller opined that Claimant seemed to be basically well-functioning, but that the discoid lupus could have more debilitating progressive features over time. *Id.*

Addison underwent a disability evaluation by family practitioner, Randall J. Cross, M.D., on May 30, 2002. (R. 142-49). Dr. Cross noted that Claimant had some scarring on her arms and body, Heberden's and Bouchard's nodules of the distal interphalangeal and proximal interphalangeal joints, respectively, stiffness in her ankles, and diminished range of motion in her knees, ankles, right hip, and back. *Id*. Dr. Cross also stated that Claimant could heel-walk, toe-walk, squat and rise without difficulty. *Id*. He diagnosed Addison with "osteopenia, osteoporosis and osteoarthritis, most likely secondary to discoid lupus," chronic fibromyalgia, degenerative disc disease of the lower back, previous foot fracture with nonunion of the right fifth metatarsal, severe and widespread scarring secondary to discoid lesions of lupus and situational anxiety with some depression. (R. 144). He opined that Addison's generalized fatigue, malaise, joint pain, muscle pain, and tenderness in the 12 of 18 trigger point areas diminished her stamina and made her unable to complete eight-hour workdays. (R. 144-45). He stated that the "patient will not demonstrate any significant improvement over a long period." (R. 145).

A Residual Physical Functional Capacity Assessment was completed by a DDS physician on July 30, 2002. (R. 183-90). The DDS physician opined that Claimant could lift and carry twenty pounds occasionally and ten pounds frequently, could sit, stand and/or walk six hours in an eight-hour workday, and had no other physical limitations. (R. 184-87). Although concluding that Addison had medically determinable impairments of degenerative disc disease in her lumbar spine, discoid lupus (improving), osteopenia, fibromyalgia and right foot fracture, the physician discounted Allison's complaints noting that she had made two trips to Texas since filing her claim (due to her father's severe illness) and was currently involved in a class action lawsuit regarding her breast implants which had elicited Dr. Miller's statement that further investigation was needed to determine if the implants were the cause of her problems. (R. 188). The DDS physician also discounted Dr. Cross' opinion that Addison could not work based on Dr. Miller's and Dr. Hayes' determinations otherwise. (R. 189).

On October 2, 2003, Addison was seen by Barclay J. Sappington, D.O., complaining of a rash, left ovary pain, sleeplessness and no regular exercise. (R. 225). Dr. Sappington assessed her with degenerative joint disease, osteoporosis and fibromyalgia. *Id*. On January 20, 2004, Dr. Sappington ordered a CT scan of the brain due to Addison's complaint of a knot over her eye, headache and confusion resulting from a fall. (R. 222). The CT scan on January 22, 2004 was normal. (R. 221). In March 2004, Addison complained of a sprained ankle and continued itching. (R. 227).

At the supplemental hearing on March 23, 2004, medical expert Subramaniam Krishnamurthi, M.D., testified that based on the medical records Addison had fibromyalgia, discoid lupus, osteoarthritis and a history of depression. (R. 276, 279). He opined that her

impairments neither singly nor in combination met or equaled a listing; but that the symptoms from her lupus and fibromyalgia limited Addison to lifting and carrying twenty pounds occasionally and ten pounds frequently, and standing and/or walking and sitting six hours in an eight-hour day, with no other limitations. (R. 273).

On May 30, 2002, Addison underwent a full psychological consultation by Steven Akeson, Psy. D. (R.136). During that evaluation, Claimant reported that she was independent for all self-care, that she was capable of reading, writing, using the telephone, handling mail and money, and that she prepared meals, shopped for groceries, and kept house. (R. 139). Mr. Akeson reported that Addison appeared to have adequate insight and judgment skills, with clear speech and thought processes. (R. 139). Claimant also appeared alert and oriented, with adequate attention, concentration, and mathematical functioning. *Id*. Dr. Akeson reported that Addison appeared to have problems with memory function, but otherwise performed well in the mental status examination. (R. 140). He determined that an Adjustment Disorder with mixed anxiety and depressed mood appeared to be an appropriate diagnosis for Claimant, and stated that her ability to perform work-related functions seemed unimpaired. (R. 140-41).

## Procedural History

On April 4, 2002, Claimant filed for disability insurance benefits under Title II, 42 U.S.C. § 401 *et seq.* (R. 49-51). Claimant's application for benefits was denied in its entirety initially and on reconsideration. (R. 38-39). A hearing before ALJ Lantz McClain, was held December 8, 2003, in Tulsa, Oklahoma. (R. 228-54). A supplemental hearing was held on March 23, 2004. (R. 255-87). By decision dated April 14, 2004, the ALJ found that Claimant was not disabled at any time through the date of the decision. (R. 14-26). On March 17, 2005,

the Appeals Council denied review of the ALJ's findings. (R. 7-9). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §404.981.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . ." 42 U.S.C. §423(d)(1)(A). A Claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. §423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §404.1520.[1]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1991).

---

[1] Step One requires the Claimant to establish that she is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the Claimant establish that she has a medically severe impairment or combination of impairments that significantly limit her ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the Claimant is engaged in substantial gainful activity (Step One) or if the Claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the Claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1. A Claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the Claimant must establish that she does not retain the residual functional capacity ("RFC") to perform her past relevant work. If the Claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the Claimant, taking into account her age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

Substantial evidence is such evidence "as a reasonable mind might accept as adequate to support a conclusion." *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001) (quotations omitted). In reviewing the decision of the Commissioner, the court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Id*. (quotations omitted). Nevertheless, the court examines "the record as a whole, including whatever in the record fairly detracts from the weight of the Secretary's decision and, on that basis, determine[s] if the substantiality of the evidence test has been met." *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800-01 (10th Cir. 1991) (quotations omitted).

### Decision of the Administrative Law Judge

The ALJ made his decision at the fourth and fifth step of the sequential evaluation process. He found that Addison had severe impairments of osteopenia, osteoporosis, osteoarthritis, discoid lupus, degenerative disc disease, post-right foot fracture, fibromyalgia and skin scarring, but that none of these impairments either singularly or in combination met or medically equaled a listed impairment. (R. 16, 25). The ALJ concluded that Claimant had the residual function capacity ("RFC") to "lift and/or carry 20 pounds occasionally and 10 pounds frequently; walk and/or stand (with normal breaks) about 6 hours in an 8-hour workday; sit (with normal breaks) about 6 hours in an 8-hour workday; and requires an air conditioned environment." (R. 22, 25). Based upon the RFC, the ALJ concluded that Claimant could perform her past relevant work as a cashier and a front desk clerk, and that, in the alternative, she had the RFC to perform a significant range of light work. (R. 23-26). The ALJ further concluded that although Claimant could not perform the full range of light work, there were a significant number of jobs in the national economy that she was capable of performing based on

the Medical Vocational Guidelines of 20 C.F.R., Part 404, Subpart P, Appendix 2, Rules 202.15 and 202.22, and the testimony of the vocational expert. *Id*. Accordingly, the ALJ concluded that Claimant was not disabled under the Social Security Act at any time through the date of the decision. *Id*.

## Review

Plaintiff contends that the ALJ's RFC and credibility determinations are not supported by substantial evidence. The Court disagrees.

**A.     Residual Functional Capacity**

Addison asserts that the ALJ's determination of her RFC is not supported by substantial evidence. An ALJ's assessment of an individual's RFC represents the most work an individual can do despite any impairments an individual may have. 20 C.F.R.§ 404.1545(a)(1). Social Security Ruling ("SSR") 96-8p further explains that a RFC

> is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to perform work-related physical and mental activities. . . . RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis; . . . [i.e.,] 8 hours a day, for 5 days a week, or an equivalent work schedule. RFC does not represent the least an individual can do despite his or her limitations or restrictions, but the most.

SSR 96-8p, 1996 WL 374184 at *2. In evaluating the claimant's RFC, the ALJ must consider all the relevant evidence, including, *inter alia,* medical history, medical signs and laboratory findings, any effects from treatment, the claimant's daily activities and testimony, effects of symptoms, such as pain, attributed to medically determinable impairment, and medical source

9

statements.[2] *Id*. at *5. This assessment is used in the fourth and fifth steps of an ALJ's disability evaluation. 20 C.F.R. § 404.1520(e).

An ALJ's determination of an individual's RFC must be supported by substantial evidence. "Substantial evidence requires more than a scintilla, but less than a preponderance, and is satisfied by such evidence that a reasonable mind might accept to support the conclusion." *Sorenson v. Bowen*, 888 F.2d 706, 710 (10th Cir. 1989).

The Court finds that there is substantial evidence in the record to support the ALJ's assessment of Claimant's RFC. The ALJ did not, as Addison contends, simply reject the opinion of Dr. Cross and adopt the opinion of Dr. Krishnamurthi. Rather, the ALJ, "after careful consideration of the entire record," determined that Plaintiff had the RFC to "lift and/or carry 20 pounds occasionally and 10 pounds frequently; walk and/or stand (with normal breaks) about 6 hours in an 8-hour workday; sit (with normal breaks) about 6 hours in an 8-hour workday; and requires an air-conditioned environment." (R. 22).

In support of this determination, the ALJ specifically mentioned that the examining rheumatologist, Dr. Hayes, placed no work limitations on Addison, advised her that she should walk two miles or thirty minutes a day, and considered her positive ANA to be a false positive because she had a full range of motion in her joints and did not exhibit any joint swelling. (R.

---

[2] "Medical source statements are medical opinions submitted by acceptable medical sources, including treating sources and consultative examiners, about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis," and are "based on the medical sources' records and examination of the individual; i.e., their personal knowledge of the individual." SSR 96-5p, 1996 WL 374183 at *4. The medical opinions of treating physicians concerning the nature and severity of a claimant's impairment(s), in particular, are entitled to "special significance," whether or not they are accorded controlling weight. *Id*. "If the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184 at *7.

21).  The ALJ also cited treating physician Dr. Miller's statements that Addison's osteopenia could be reversed with medication and that she was not always compliant with her medication, resulting in exacerbation of her pain. *Id*.  Although he noted that Addison had been diagnosed with fibromyalgia with tenderness at multiple trigger points, the ALJ stated that she failed to take her prescribed medication on a consistent basis. *Id*.  He cited Dr. Miller's May 7, 2002 treatment record that Addison's discoid lupus was "markedly improved" with medication and that Addison had never complained that the medication to prevent itching was ineffective. (R 21-22).

Additionally, the ALJ did consider the opinion of Dr. Cross but chose not to accord Dr. Cross' opinion any weight. (R. 21).  The ALJ first noted that Dr. Cross' opinion that Addison was permanently disabled was an opinion on an issue reserved to the Commissioner and was not entitled to controlling weight. *Id*.  He then found that it was not entitled to special significance because Dr. Cross was neither Addison's treating physician nor a rheumatologist like Dr. Hayes; rather, he was a consulting family practice physician. *Id*.  The ALJ also discredited Dr. Cross' opinion as appearing to be based on "symptoms related to him by the claimant rather than objective clinical findings" and noted that his opinion was inconsistent with the findings of his examination; *e.g.*, Addison was able to heel-walk, toe-walk, squat and rise without difficulty. (R. 12, 144).

Additional evidence in the record supports the ALJ's RFC finding.  In the claimant questionnaire, signed by Addison on May 1, 2002, thirty days prior to her examination by Dr. Cross, Addison stated that although she could not do any outside chores, she did laundry, vacuumed, shopped for groceries for about one hour, cooked her own meals, walked approximately 45 minutes daily and loved to fish on cloudy days.  (R. 84-85).  Further, two

11

months after Dr. Cross' evaluation, Addison's treating physician Dr. Miller opined that although Addison could not tolerate rigorous jobs such as waiting tables and excessive lifting, she was "basically well-functioning in terms of her daily activities" and could probably do some office work or other work with minimal standing and lifting. (R. 192). Finally, upon review of all the evidence, medical expert Dr. Krishnamurthi concluded that Addison could lift and carry twenty pounds occasionally and ten pounds frequently, and stand and/or walk and sit six hours in an eight-hour day, with no other limitations. (R. 273).

While Dr. Cross opined that Addison could not complete an 8-hour workday (R. 144), it was permissible for the ALJ to choose not to accord Dr. Cross' opinion any weight because it conflicted with other evidence in the record, conflicted with opinions of other physicians, and because "findings of a nontreating physician based upon limited contact and examination are of suspect reliability." *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987). The Court thus finds that the ALJ's determination of Plaintiff's RFC is supported by substantial evidence.

**B.     Credibility**

The ALJ found, after considering Addison's credibility, motivation, and the medical evidence, that she exaggerated her symptoms of disabling pain. (R. 22). Plaintiff contends that this determination is not supported by substantial evidence.

"Credibility is the province of the ALJ." *Hamilton v. Secretary of Health & Human Services of U.S.*, 961 F.2d 1495, 1499 (10th Cir. 1992). Therefore, this Court gives great deference to the credibility determinations of the ALJ. *Fowler v. Bowen*, 876 F.2d 1451, 1455 (10th Cir. 1989). Once a claimant has established that there is a pain-producing impairment and there is a loose nexus between the impairment and the claimant's allegations of pain, an ALJ

must decide, after "considering all the evidence, both objective and subjective, [whether the] [c]laimant's pain is in fact disabling." *Kepler v. Chater*, 68 F.3d 387, 390 (10th Cir. 1995) (quotations omitted). While an ALJ need not conduct a factor-by-factor analysis of the evidence in his opinion, he must set forth "the specific evidence he relies on in evaluating the claimant's credibility." *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

This Court finds that there is substantial evidence in the record to support the ALJ's determination that Addison's allegations of disabling pain are not credible. As the ALJ noted, Addison did not take her medication on a consistent basis. (R. 21). "[F]ailure to follow prescribed treatment is a legitimate consideration in evaluating the validity of an alleged impairment." *Decker v. Chater*, 86 F. 3d 953, 955 (10th Cir. 1996). The ALJ also noted that Addison testified that she was afraid of breaking bones due to her osteopenia; however, the medical evidence indicated that her osteopenia was mild and reversible with medication. (R. 20-21). Finally, the ALJ observed that Addison may have been "exaggerating her symptoms to support her involvement in a civil suit because of breast implants." (R. 21). The motivation of the claimant is another factor that the ALJ should consider in a credibility determination. *Kepler*, 68 F.3d at 391 (quotations omitted).

Additional evidence in the record supports the ALJ's determination that Addison's allegations of pain are not credible. Her own testimony is inconsistent: at the December 8, 2003 hearing with the ALJ, Addison testified that she rarely drives; she no longer engages in hobbies she formerly enjoyed; and her husband does most of the cooking and household chores. (R. 245, 247-48). However, she stated in May 2002, one month after she filed her application for benefits, that she was capable of doing laundry; she cooked her own meals; she could and did

drive up to seven miles; she could walk to the store; and she would fish on cloudy days. (R. 84-85).

The evidence relied upon by the ALJ, as well as additional evidence in the record, support the ALJ's determination that Addison's claims of pain and fatigue are not credible. The Court thus finds that the ALJ's credibility determination is supported by substantial evidence.

## Conclusion

As the ALJ's RFC and credibility determinations are supported by substantial evidence, the decision of the Commissioner is **AFFIRMED**.

DATED this 2nd day of August, 2006.

_____
Paul J. Cleary
United States Magistrate Judge